**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ERICA RAMIREZ, on behalf of herself and all other persons similarly situated, | ) ) ) | |
| | ) | Civil Action No.: |
| Plaintiff, | ) | 1:21-cv-00762-AT |
| v. | ) | |
| | ) | |
| SNAPMEDTECH, INC. dba SNAPNURSE, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Defendant SnapMedTech, Inc. d/b/a SnapNurse ("SnapNurse" or "Defendant") states the following:

## I. INTRODUCTION

Plaintiff Erica Ramirez ("Ms. Ramirez" or "Plaintiff") filed her putative class and collective action on the basis that Defendant violated the Fair Labor Standards Act ("FLSA") by not paying her minimum and overtime wages while simultaneously alleging that she did not perform any work for Defendant. Plaintiff further alleges that Defendant breached its contract with Plaintiff, yet the purported contract is not signed by any party and does not define the place of employment,

the amount of compensation to be paid, or the services to be performed.  Defendant did not employ Plaintiff and no enforceable contract exists between the parties. The Complaint should be dismissed in its entirety on summary judgment.

## II.    STATEMENT OF FACTS[1]

### A. About SnapNurse.

SnapNurse is a healthcare staffing agency that connects healthcare facilities in need of nurses with travel nurses in search of work.  (Complaint, Dkt. 1, ¶ 3; Deposition of Kim Grant ("Grant Dep."), attached hereto as **Exhibit 1**, 13: 6 – 11.) Although the travel nursing industry is not new, it has expanded in recent years due to the onset of the Covid-19 global pandemic.  (Grant Dep. 13: 23 – 14: 4.)

In order to recruit nurses, SnapNurse runs social media advertisements or campaigns.  (Grant Dep. 14: 6 – 13.) Once SnapNurse recruits a nurse for a particular assignment, the nurse must complete the onboarding process to become credentialed to work with and be employed by SnapNurse.  (Grant Dep. 31: 24 – 32: 6.)   As part of the onboarding process, a nurse must provide various documents, including but not limited to a negative drug screen, a negative Covid test, a skills checklist, background check, an I-9 form, and licensing information.

---

[1] Pursuant to Local Rule 56.1(B), Defendant has attached a separate statement of the material facts as to which there is no genuine issue to be tried.

(Grant Dep. 32: 25 – 33: 4; 36: 5-10.)  Some of this information may be provided in advance; however, there is certain information that must be submitted at the job site.  (Grant Dep. 33: 5-11.)  While some nurses may be local, other nurses travel across states to accept an assignment at a designated healthcare facility.  (Grant Dep. 16: 1-3.)

**B. The August 2020 State of Florida Assignment.**

In August 2020, SnapNurse contracted with the State of Florida to provide nurses to Fort Lauderdale healthcare facilities to conduct Covid testing.  (Grant Dep. 22: 11 – 19; 25: 21 – 26: 4; 50: 20 - 23.)  SnapNurse recruited nurses for the potential assignment in Florida.  (Grant Dep. 26: 15-19.)  Ms. Ramirez and Opt-In Plaintiffs Michael Lackowski, Teresa Burns, Deirdre Dunn, Ameera Brewer, Kristin Hill, Mia Francis, Cassandra Lacey, and Tessie Sampson[2] (collectively, "Plaintiffs") learned about the potential assignment in Florida and pursued the opportunity to work with SnapNurse.[3]  (Deposition of Erica Ramirez ("Ramirez Dep."), attached as **Exhibit 2**, 44: 21-24.)

---

[2] Ms. Sampson filed a Notice of Voluntary Dismissal with the Court on October 21, 2021 [Dkt. 36], but subsequently chose to proceed with her claims.

[3] Opt-In Plaintiffs Eric Baker, Monroe Branch, Chandra Causey, Jolie Michelle Hoffman, and Maidelin Palenzuela withdrew from the case because they were no longer interested in pursuing their claims [Dkt. 48], and Opt-In Plaintiffs Jadeyn

### 1.  The SnapNurse Covid Mission Information Sheet.

SnapNurse provided some of the Plaintiffs with a SnapNurse Covid Mission Information Sheet ("MIS"), which included information about the potential assignment in Florida.  (Complaint, Ex. A; Ramirez Dep. 71: 4-5.)   The MIS contained information regarding the potential assignment, including the anticipated start dates of 8/22-8/24/2020 and anticipated end dates of 9/4-9/6/2020. (Complaint, Ex. A.)  The MIS stated that nurses would be "paid at the regular rate of pay with OT rates if needed[;]" however, it did not define the regular rate. (Complaint, Ex. A, p. 1.)  The MIS also provided nurses with the option to either fly or drive to Fort Lauderdale and stated that SnapNurse would cover certain travel costs.  (Complaint, Ex. A, p.2.) The MIS provided that "[a]ll applicants must be flexible by committing to working at least 12 hours per day and floating to units in which you are qualified to work."  (Complaint, Ex. A. p. 4.)

### 2.  Plaintiffs Reported to the Ft. Lauderdale Embassy Suites.

SnapNurse told nurses interested in the assignment to report to the Embassy Suites in Ft. Lauderdale, Florida to continue the application process, pending SnapNurse's anticipated receipt of specific assignments from the State of Florida.

---

Lacey, Cassandra Lacey, and Jasmine White withdrew from the case because they were not recruited for the Ft. Lauderdale assignment [Dkt. 49].

(Grant Dep. 51: 15-20.)   Although almost every Plaintiff had prior experience working as travel nurses for other agencies, most had never worked for SnapNurse prior to applying for the assignment in Fort Lauderdale.  (Ramirez Dep. 31: 20-22; 44: 18-20; Deposition of Michael Lackowski ("Lackowski Dep."), attached hereto as **Exhibit 3**, 28: 4-6; Deposition of Mia Francis ("Francis Dep."), attached hereto as **Exhibit 4**, 23: 24 – 24: 1; Deposition of Teresa Burns ("Burns Dep."), attached hereto as **Exhibit 5**, 22: 24 – 23:5; Deposition of Kristin Hill ("Hill Dep."), attached hereto as **Exhibit 6**, 38: 8-10.)

Plaintiffs understood that they had the choice to either accept or decline to pursue the opportunity in Fort Lauderdale.   (Deposition of Ameera Brewer ("Brewer Dep."), attached hereto as **Exhibit 7**, 40: 6-16; Lackowski Dep. 28: 10-15.)  Some Plaintiffs chose to fly to Fort Lauderdale (Hill Dep. 48: 22-23), while other Plaintiffs chose to drive (Lackowski Dep. 32: 11-13).  SnapNurse either paid or reimbursed nurses for their travel costs to and from Fort Lauderdale.  (Francis Dep. 51: 24 – 52: 2: Deposition of Deirdre Dunn ("Dunn Dep."), attached as **Exhibit 8**, 38: 8-12; Lackowski Dep. 55: 14-23.)   Once they arrived at the Embassy Suites, the nurses took part in a "job fair" in which they were asked to finish the credentialing process so as "to become eligible for employment for th[e] assignment."  (Grant Dep. 50: 24 – 51: 1-6.)  While many nurses completed the

5

credentialing process, others did not fulfill all pre-employment steps listed on the

MIS, such as passing a drug screen.  (Ramirez Dep. 85: 25 – 86: 3; 87: 7-10; Hill

Dep. 66: 22 – 67: 4.)

SnapNurse did not put any restrictions on what the nurses could do while

they were waiting on an assignment:

> Q:      Did [SnapNurse] place any other limitations on what you could
>         do or could not do during that time period while you were
>         supposedly on standby?
> A:      No.

(Brewer Dep. 58:  11-14.)

> Q:      And when you were done, you didn't have an assignment right
>         away, right?
> A:      No.
> Q:      What – what did you do next?
> A:      After we left that – I went to that meeting and listened to what
>         the lady was talking about.  And then, she told us, you know,
>         just go and venture out.  You're free to go – you know, just go
>         and venture out. . . .

(Francis Dep. 46: 3 – 10.)

Indeed, while waiting for an assignment, Plaintiffs had the opportunity to

use their time to pursue personal activities of their choice.  While some chose to

stay in their hotel rooms, several ventured out to restaurants, used the pool, went

shopping, visited local family members, and even took a boat cruise:

Q:    And then, what did you guys do – what did you do next?

A:    We went to the grocery store, bought some groceries, and then we came back to the hotel.  Well, we came back to the hotel, changed clothes, and then we went out to eat at a nearby restaurant we could walk to.

(Francis Dep. 43: 7-12.)

Q:    What – what did you do next?

A:    . . .  So myself and Mia [Johnson], we took the car and we went to Florida – another part of Florida.  I have a relative that lives there.  And we went to see her.
      . . .

Q:    And what part of Florida does your relative live in?

A:    She lives in Key West.
      . . .

Q:    And then, what did you do then?

A:    We didn't do anything.  We just all – you know, like, the three girls that I know, I went to – I think to Cindy's room and we sat around and talked.  And that was it.

(Francis Dep. 46: 10 – 47: 9.)

Q:    So that was Sunday the 23rd, and then what happened the morning of Monday, August 24th?

A:    Monday, we still didn't have any assignments.  . . . So Mia Johnson and Carina and myself, we went to Miami.  We hung out in Miami, did a little boat cruise, you know, ride, just basically relaxing for the day.  And we stayed out there a couple of hours.
      . . .

Q:    Okay.  So that's Monday, the 24th.  Did you guys do anything else other than go on the boat cruise?

A:    Just – no.  Just walked around whatever that site was right there where the boat took place.  There were, like eateries there and shops.  And we went shopping and bought some souvenirs.  That was it.

7

(Francis Dep. 47: 17 – 48: 11.)

Q:     Did you ever leave the hotel to get something to eat, for personal errand, or anything like that?

A:     Yes.

Q:     What did you leave the hotel to do?

A:     To go get groceries and to – I drove one time to get groceries, and I walked one time to get dinner in a nearby plaza, like something walking distance.

(Hill Dep. 57: 5-13.)

Q:     What did you do while you were at the hotel?

A:     Slept, ate, and waited.  I used the pool.  And that's pretty much all I can remember.  Maybe I talked with some other nurses.  Yeah, I mean, I did.  So I don't remember –

Q:     Did you watch TV?

A:     Yeah, watched some TV.

(Lackowski Dep. 63: 11 – 18.) SnapNurse paid hotel costs for travel nurses while they stayed in Fort Lauderdale waiting for an assignment.  (Deposition of Tessie Sampson ("Sampson Dep."), attached as **Exhibit 9**, 67: 11-13.)

### 3.  SnapNurse Did Not Provide Plaintiffs with an Assignment.

On August 25, 2020, SnapNurse sent a text message to Plaintiffs, stating as follows:

SnapNurse has filled all the mission positions for the State of Florida.  If you have not received a mission, then you must check out of the hotel today or tomorrow.  New missions will be issued to SnapNurse to start on 9/5.  Reply YES if you want to be placed on the priority list for 9/5 start or NO if you want to be removed.

(Ramirez Dep., Ex. 9, p. 11.)  SnapNurse did not provide Plaintiffs with work at the Fort Lauderdale site.  (Complaint, ¶ 33; Burns Dep. 36: 10-13.)

### III.   STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Although the Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### IV.   MEMORANDUM OF LAW

#### A. SnapNurse Did Not Employ Plaintiffs, and Plaintiffs Did Not Perform Work on Behalf of Defendant.

Plaintiff alleges that SnapNurse "is liable for its failure to pay Plaintiff and members of the putative class for all hours worked and time and a half for hours worked in excess of 40" in violation of the FLSA.  (Complaint, ¶ 10.)  At the same time, she complains that she "***was not provided work*** as guaranteed by her contract."  (emphasis added) (Complaint, ¶ 33).

It should be obvious that Plaintiff is not entitled to compensation for work that was never provided, let alone performed.  Her decision to travel to and from Ft. Lauderdale, Florida to pursue potential employment with SnapNurse, as well as her time waiting to see whether the employment opportunity would materialize, is not compensable.   Plaintiff's FLSA claims are therefore subject to summary judgment.

### 1.  Plaintiffs Were Not Employees Under the FLSA.

The FLSA requires employers to pay their ***employees*** a minimum wage.  *See* 29 U.S.C. § 206(a)(1) (emphasis added).  "Employ" means "to suffer or permit to work."  *Id.* § 203(g).  An employee is "any individual employed by an employer." *Id.*  "The test of employment under [this definition] is one of economic reality." *Tony & Susan Alamo Found. V. Sec'y of Labor,* 471 U.S. 290, 301 (1985).  The law expands the definition of employee beyond traditional common-law definitions.  *Williams v. Strickland*, 87 F.3d 1064, 1066 (9th Cir. 1996) (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150 (1947)). Yet, the FLSA's definition does not "stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another[.]" *Id.* Likewise, people are not employees if their work serves only their own interests—even if someone else assists them. *Id.*  The

10

FLSA's protections also do not extend to applicants or prospective employees.  *See Dellinger v. Science Applications Intern. Corp.*, 649 F.3d 226, 229 (4th Cir. 2011) ("We have been unable to find any case that extends FLSA protections to applicants or prospective employees.")

Plaintiffs allege that pursuant to the MIS, they entered into a contract with SnapNurse that guaranteed "48 hours of work."  (Complaint, ¶ 65; Complaint, Ex. A, Dkt. 1-1; Ramirez Dep. 82: 11-18.)  The MIS described a "48-hour guarantee" for those "available and ***eligible*** to work all assigned hours."  (emphasis added) (Complaint, Ex. A, p. 1.)  Among other requirements, the MIS stated that nurses "must pass a 10 panel drug screen for controlled substances before working." (Complaint, Ex. A, p. 4.)  The MIS further stated that "[g]uaranteed hours will be from the start of the assignment . . . not upon arrival at the hotel."  (Complaint, Ex. A, p. 1.)  The MIS stated that shifts are "assigned on-site" and "[t]here is no [g]uarantee of [s]hift time."  (Complaint, Ex. A, p. 4.)  Finally, if it wasn't already obvious from the nature of the document, the MIS made clear that nurses were still in the application stage, stating, "[a]ll ***applicants*** must be flexible by committing to working at least 12 hours per day and floating to units in which you are qualified to work."  (emphasis added) (Complaint, Ex. A, p. 4.)

While many nurses completed the credentialing process, others did not fulfill all necessary steps listed on the MIS to become employed by SnapNurse, such as passing a drug screen.  Specifically, Ms. Ramirez did not obtain a negative drug screen prior to the anticipated start date of the assignment.

> Q:      And so this would suggest that SnapNurse did not receive your
>           test result until August 29; correct?
> A:      Correct.
>           …
> Q:      [T]heir documents that you signed say that you are not eligible
>           to work until you have passed the drug test, correct?
> A:      Correct.

(Ramirez Dep. 85: 25 – 86: 3; 87: 7-10.)  Similarly, Opt-In Plaintiff Kristin Hill never even took a drug screen for SnapNurse.  (Hill Dep. 66: 22 – 67: 4.)  And, all Plaintiffs concede that when they arrived at the worksite, they were "not provided work."  (Complaint, ¶ 34.)  As such, Plaintiffs were mere job applicants continuing on the application process – not "employees" under the FLSA.  The few courts to consider the issue have uniformly held that job applicants are not employees under the FLSA.  *See Dellinger v. Sci. Applications Int'l Corp.*, 649 F.3d 226 at 230; *Harper v. San Luis Valley Reg'l Med. Ctr.*, 848 F. Supp. 911, 913 (D. Colo. 1994); *Glover v. City of N. Charleston, S.C.*, 942 F. Supp. 243, 247 (D.S.C. 1996).

For instance, in *Nance v. May Trucking Co.*, truck drivers attended defendant's mandatory three-day orientation program as a step in the application

process for securing employment with defendant.  685 Fed.Appx. 602, 604-5 (9th Cir. 2017).  The Ninth Circuit affirmed the district court's decision holding that the drivers were orientation attendees and not "employees" pursuant to the FLSA and the defendant was therefore not required to pay them for their time attending orientation.  *Id.* Similarly, in *Saini v. Motion Recruitment Partners, LLC*, the plaintiff received a position with a company through defendant, a staffing agency; however, the company canceled the position before plaintiff could start work. Case No. SACV 16-01534 JVS (KESx), 2017 WL 1536276, * 5 (C.D. Ca. Mar. 6, 2017).  The court held that plaintiff's time interviewing for the position, which was time spent primarily for his own benefit, was not compensable under the FLSA because plaintiff was not yet an employee.  *Id.*  Here, because Plaintiffs were not "employees" under the FLSA, they were not entitled to compensation and summary judgment is warranted on their FLSA claims.

### 2.  Plaintiffs' Travel Time is Not Compensable.

Under the FLSA, 29 U.S.C. § 206, employers must pay their employees the hourly minimum wage for all hours worked.  However, under the "Portal-to-Portal Act," 29 U.S.C. § 254, employers do not have to pay for the following activities:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

13

> (2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).

Here, Plaintiffs were nurses who traveled to Fort Lauderdale to complete credentialing for potential employment with SnapNurse at one of many healthcare facilities in Florida.  Many Plaintiffs had worked as travel nurses for years and believed a primary benefit of working as a travel nurse was having the opportunity to experience new places.  (Ramirez Dep. 31: 20-22; 44: 18-20; Hill Dep. 33: 9-11; Brewer Dep. 20: 3-5.)   Although Plaintiffs had worked for other travel nurse agencies, most had never worked for SnapNurse prior to applying for the assignment in Fort Lauderdale.  (Ramirez Dep. 31: 20-22; 44: 18-20; Lackowski Dep. 28: 4-6; Francis Dep. 23: 24 – 24: 1; Burns Dep. 22: 24 – 23:5; Hill Dep. 38: 8-10.)  Plaintiffs understood that they had the choice to either accept or decline to pursue the opportunity in Fort Lauderdale.  (Brewer Dep. 40: 6-16; Lackowski Dep. 28: 10-15.)

Although some nurses already resided locally in Florida, many nurses either drove (Lackowski Dep. 32: 11-13) or flew (Hill Dep. 48: 22-23) from other states

to Fort Lauderdale for the potential assignment. (Grant Dep. 16: 1-3.) While SnapNurse paid for the nurses' hotel rooms and either paid or reimbursed nurses for the roundtrip costs of their travel to and from Fort Lauderdale, SnapNurse did not compensate nurses for their travel time. (Sampson Dep., 67: 11-13; Francis Dep. 51: 24 – 52: 2: Dunn Dep. 38: 8-12; Lackowski Dep. 55: 14-23.)

Federal courts applying the Portal-to-Portal Act to facts similar to those in the instant case have uniformly held that such travel time is not compensable under the FLSA. For instance, in *Vega v. Gasper*, the defendant was a farm labor contractor. 36 F.3d 417, 422 (5th Cir. 1994), *abrogated on other grounds*, *Bridges v. Empire Scaffold, L.L.C.*, 875 F.3d 222, 228 (5th Cir. 2017). Farmers hired the defendant to employ farm workers and to transport them by bus to the fields where they worked. *Id*. at 422-23. The workers used their own transportation to travel from their homes, usually in Juarez, Mexico, to a meeting place in El Paso, Texas, where they boarded the defendant's bus to travel to their places of work. *Id*. at 423. The plaintiffs, a group of farm workers who spent at least 4 hours daily traveling to and from work on the defendant's bus, brought suit under the FLSA for, inter alia, unpaid wages for the time they spent riding on the bus.

The district court awarded the plaintiffs damages for the time they spent traveling to and from the farms where they worked, but the Fifth Circuit Court of

Appeals reversed, holding "that the travel time here is a non-compensable preliminary and postliminary activity based on the Portal-to-Portal Act and related jurisprudence." *Id*. at 425. The court explained that "[o]rdinary home-to-work travel is clearly not compensable under Portal-to-Portal Act unless a contract or custom of compensation exists between the employer and the employees" and that "the travel time here was indisputably ordinary to-work or from-work travel and not compensable." *Id*. at 424-25. The court distinguished cases in which employees were required to report at a meeting place to receive instructions or to pick up and carry tools, or to perform other work and described the plaintiffs' travel as "just an extended home-to-work-and-back commute."

The case of *Bonilla v. Baker Concrete Const., Inc.* is also instructive. 487 F.3d 1340 (11th Cir. 2007). In *Bonilla*, the plaintiffs were construction workers employed by defendant, a subcontractor for a project at the Miami International Airport. *Id*. at 1341. In order to reach their work sites inside the airport, the workers were required to pass through a security checkpoint to the tarmac and then ride authorized buses or vans to their particular work site. *Id*. The workers did not perform any labor while waiting for or riding the vehicles, did not carry any tools on the buses, and did not receive instructions from their supervisors until they reached the job site. *Id*. At the end of the day, the workers signed out at the job

16

site before boarding the bus to leave the airport through the security gate. *Id*. The Eleventh Circuit affirmed the district court's order holding that the time spent traveling on employer-provided transportation to and from the site was not compensable. *Id*. at 1343.

The same analysis used by the *Vega* and *Bonilla* courts in interpreting the Portal-to-Portal Act also mandates the entry of summary judgment in this case. Plaintiffs' travel time in this case was a natural byproduct of their choice to work as a travel nurse. Plaintiffs knew when they applied for the position with SnapNurse that traveling to Fort Lauderdale was a condition of potential employment and they voluntarily chose to do so. (Brewer Dep. 40: 6-16; Lackowski Dep. 28: 10-15.) None of the travel nurses had any reason to expect that they would receive additional compensation for their commute time. Plaintiffs could not have performed any labor or work of any kind while they were commuting to or from Fort Lauderdale because they were not yet employed by SnapNurse and the work to be done could only be performed at a healthcare facility. Plaintiffs cannot introduce any evidence of any custom or practice in effect at any time where SnapNurse paid any employee for traveling to and from a job site because no such evidence exists. The time Plaintiffs spent traveling to and from Fort Lauderdale is not compensable under the FLSA.

### 3.  Plaintiffs' Wait Time Is Not Compensable.

Plaintiffs are likewise not entitled to compensation under the FLSA for their time in Ft. Lauderdale.   The key distinction between compensable and non-compensable waiting time is whether the employee is "engaged to be waiting" or "waiting to be engaged." *Preston v. Settle Down Enters.*, 90 F.Supp.2d 1267, 1278 (N.D. Ga. 2000).   "When employees are engaged to wait for the employer's call to duty, this time may be compensable under the FLSA."   *Birdwell v. City of Gadsden, Ala.,* 970 F.2d 802, 807 (11th Cir.1992).   The question of whether the employees are working during this time for purposes of the FLSA depends on the degree to which the employee may use the time for personal activities. *Id.*   If the time is spent predominately for the benefit of the employer, then it is compensable under the FLSA.  *Id.*   An employee's use of time must be severely restricted to be considered spent predominately for the benefit of the employer. "The FLSA requires employers to compensate an employee for on-call time only where the employee's on-call duties severely restrict the employee's use of his or her personal time." *Burnette v. Northside Hosp.*, 342 F.Supp.2d 1128, 1135 (N.D. Ga. 2004).

Decisions from this Circuit and others indicate the "severely restricted" standard is a stringent one and employees are not entitled to pay for wait time

under the FLSA absent unusually onerous on-call duties. *See, e.g., Birdwell,* 970 F.2d at 808 (holding detectives' on-call duties did not severely restrict use of their free time where detectives who did not purchase their own beepers could not participate in outdoor activities such as fishing or hunting, leave town, or go on vacation while on call); *Bright v. Houston Northwest Med. Ctr.,* 934 F.2d 671 (5th Cir.1991) (holding biomedical equipment repair technician's on-call duties did not significantly restrict use of free time where technician was called in to work an average of five times per week and was required to report to the hospital within twenty minutes of being paged); *Rutlin v. Prime Succession, Inc.,* 220 F.3d 737, 744 (6th Cir.2000) (holding funeral embalmer's on-call duties did not significantly restrict use of free time where embalmer alleged his on-call duties prevented him from drinking alcohol, visiting his children, or boating, and that his meals, evening activities and sleep were disrupted by his on-call duties).

Here, Plaintiffs stayed at a hotel in Fort Lauderdale while waiting for a potential assignment with SnapNurse. During their wait time, SnapNurse did not restrict Plaintiffs use of their time:

> Q:   Did [SnapNurse] place any other limitations on what you could do or could not do during that time period while you were supposedly on standby?
> A:   No.

19

(Brewer Dep. 58: 11-14.)

> Q:    And when you were done, you didn't have an assignment right away, right?
> A:    No.
> Q:    What – what did you do next?
> A:    After we left that – I went to that meeting and listened to what the lady was talking about.  And then, she told us, you know, just go and venture out.  You're free to go – you know, just go and venture out. . . .

(Francis Dep. 46: 3 – 10.)

Indeed, Plaintiffs were free to use their personal time to pursue their personal interests.   Among other things, Plaintiffs went out to dinner, went shopping, watched television, spent time hanging out in one another's hotel rooms, went on a boat ride, and traveled to other cities to visit family members:

> Q:    What – what did you do next?
> A:    . . . So myself and Mia [Johnson], we took the car and we went to Florida – another part of Florida.  I have a relative that lives there.  And we went to see her.
>        . . .
> Q:    And what part of Florida does your relative live in?
> A:    She lives in Key West.

(Francis Dep. 46: 10 – 18.)

> Q:    So that was Sunday the 23rd, and then what happened the morning of Monday, August 24th?
> A:    Monday, we still didn't have any assignments.  . . . So Mia Johnson and Carina and myself, we went to Miami.  We hung out in Miami, did a little boat cruise, you know, ride, just basically relaxing for the day.  And we stayed out there a couple of hours.

. . .

Q:    Okay.  So that's Monday, the 24th.  Did you guys do anything else other than go on the boat cruise?

A:    Just – no.  Just walked around whatever that site was right there where the boat took place.  There were, like eateries there and shops. And we went shopping and bought some souvenirs.  That was it.

(Francis Dep. 47: 17 – 48: 11.)

Q:    Did you leave the hotel at any other point between day one and day three, for example, to go to a restaurant, run an errand, go to the beach?

A:    Yes.

Q:    What did you – what did you do?

A:    I went and had dinner.

Q:    Was that on day one, day two, day three, all of those?

A:    It was probably every single day.

(Lackowski Dep. 62: 18 – 63: 1.)

It is without question that Plaintiffs' waiting time was not so restricted that it was not used predominately for their benefit.  Indeed, many Plaintiffs treated their time in Fort Lauderdale like most nurses treat travel assignments – as a vacation.  (Grant Dep. 45: 24 – 46: 4.)  Plaintiffs were waiting to be engaged and their wait time was not compensable under the FLSA.

**B. Plaintiffs' Breach of Contract Claim Fails Because No Enforceable Contract Exists Between the Parties.**

Under Florida law, "an employment contract requires definiteness and certainty in it terms."  *Quaker Oats Co. v. Jewell*, 818 So.2d 574, 577 (Fla. Dist.

Ct. App. 2002).    While it is not necessary that all details of an agreement be fixed in order to have a binding agreement between parties, if there has been no agreement as to essential terms, an enforceable contract does not exist. *Jacksonville Port Authority, City of Jacksonville v. W.R. Johnson Enterprises, Inc.*, 624 So.2d 313, 315 (Fla. 1ˢᵗ DCA 1993); *see also Irby v. Memorial Healthcare Group, Inc.*, 901 So.2d 305, 306 (Fla.Dist.Ct.App. 2005) (letter proposing employment but failing to provide key details, such as terms of employment, salary of the plaintiff, and price evaluation of plaintiff's practice was held not an enforceable contract under Florida).    In the absence of an agreement, Florida follows an "at will" employment doctrine, which permits the employer to discharge the employee for any reason whatsoever. *Liff v. City of Cocoa*, 745 So. 2d 441, 441 (Fla. Dist. Ct. App. 1999).

Even if Plaintiffs could be construed to be employees of SnapNurse, no enforceable employment agreement governed the relationship.    Plaintiffs allege that the MIS, attached the Complaint as Exhibit A, constitutes their contract for guaranteed work with Defendant. (Complaint, ¶ 65.)    Yet, the MIS does not include any of the requisite terms to constitute an enforceable contract.    First, the MIS does not include the amount of compensation to be paid (or even a method of calculating compensation) – rather, it states "[g]uaranteed [h]ours are paid at the

regular rate of pay with OT rates if needed." (Complaint, Ex. A, p.1.) Yet, the regular rate is not defined anywhere in the MIS. Second, while the MIS informs applicants that they should report to the Embassy Suites in Fort Lauderdale for onboarding, the MIS does not identify a particular healthcare facility where Plaintiffs may eventually be assigned to work. Third, the MIS does not define the services to be performed, except for stating in very general terms as follows: "This is an emergency staffing project. All **applicants** must be flexible by committing to working at least 12 hours per day and floating to units in which you are qualified to work." (emphasis added) (Complaint, Ex. A.) Fourth, the MIS does not address Plaintiffs by name, nor is it executed by either party. Finally, even if the MIS could be construed as a contract (which it cannot), it is undisputed that several Plaintiffs (including Ms. Ramirez) failed to satisfy conditions precedent for the supposed 48-hour guarantee when, among other things, they did not obtain a negative drug test result prior to the anticipated start date of the assignment. (*See* Complaint, Ex. A, p. 4) ("If you do not pass the drug screen, you may not work and will be responsible for your travel costs.") Accordingly, Plaintiffs' breach of contract claim is subject to summary judgment.

### C. Plaintiffs' Promissory Estoppel Claim Fails.

The basic doctrine of promissory estoppel under Florida law provides "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So.2d 919, 924 (Fla.1989) (citing Restatement (Second) Contracts § 90 (1979)). "The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice." *Id.* The satisfaction of the latter requirement depends upon "the reasonableness of the promisee's reliance," "its definite and substantial character in relation to the remedy sought," "the formality with which the promise is made," "the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise," and "the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant." *Id.* "For promissory estoppel to be applied, the evidence must be clear and convincing." *Id.* at 925.

Plaintiffs allege that SnapNurse made "promises of employment" which give rise to a promissory estoppel claim. (Complaint, ¶ 73.) As an initial matter, it is

unclear from the Complaint what "promises of employment" form the basis of Plaintiffs' claim.  To the extent Plaintiffs' claim is based upon the language in the MIS, those "promises" are not definite enough to support a claim for promissory estoppel.  *See Camina Serv. Inc. v. Shell Oil Co.,* 816 F. Supp. 1533, 1540 (S.D. Fla. 1992) ("application of promissory estoppel may be rejected if the terms of the promise are indefinite").  Further, Plaintiffs have not evidenced that they justifiably relied on statements in the MIS when there are so many indefinite and vague terms. *See Eclipse Medical, Inc. v. American Hydro-Surgical Instruments,* 262 F.Supp.2d 1334, 1350 (S.D. Fl. 1999) (holding no justifiable reliance where a promise is lacking a definite and substantial character).  Plaintiffs' promissory estoppel claim fails and should be dismissed.

## V.   <u>CONCLUSION</u>

For the reasons stated herein, Defendant respectfully requests that the Court grant Defendant's Motion for Summary Judgment.  Defendant is entitled to its attorneys' fees and costs incurred in this matter.

Respectfully submitted this 29th day of December, 2021.

s/Matthew R. Simpson
Matthew R. Simpson
Georgia Bar No. 540260
msimpson@fisherphillips.com
JonVieve D. Hill
Georgia Bar No. 907946
jhill@fisherphillips.com
FISHER & PHILLIPS LLP
1075 Peachtree Street NE, Suite 3500
Atlanta, GA 30309
Telephone: (404) 240-4221
Facsimile:  (404) 240-4249

Amanda S. Thompson
Georgia Bar No. 622854
amanda@stlaborlaw.com
SALTER THOMPSON LAW PC
2860 Piedmont Road, NE, Suite 215
Atlanta, Georgia 30305
Telephone: (404) 247-0107
Facsimile:  (404) 920-4342

*Counsel for Defendant*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ERICA RAMIREZ, on behalf of herself and all other persons similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: 1:21-cv-00762-AT |
| v. | ) ) | |
| SNAPMEDTECH, INC. dba SNAPNURSE, INC., | ) ) ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of December 2021, I electronically filed

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS**

**MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the

CM/ECF system which will automatically send e-mail notification of such filing to

the following attorneys of record:

Daniel C. Levin, Esq.
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
dlevin@lfsblaw.com

Daniel Aaron Rihn, Esq.
Robert Pierce & Associates
707 Grant Street, Suite 125
Pittsburgh, PA 15219
arihn@peircelaw.com

Gary Franklin Easom, Esq.
The Easom Firm
125 Magnolia Hammock Dr.
Ponte Vedra Beach, FL 32082
easom76@gmail.com

                                        *s/Matthew R. Simpson*
                                        Matthew R. Simpson
                                        Georgia Bar No. 540260
                                        FISHER PHILLIPS LLP