# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

ERICA RAMIREZ, on behalf of herself
and all other persons similarly
situated,

      Plaintiff,

v.

SNAPMEDTECH, INC. d/b/a
SNAPNURSE, INC,

      Defendant.

Civil Action No.
1:21-cv-00762-VMC

## ORDER

Before the Court is the Motion of Defendant SnapMedTech, Inc. d/b/a SnapNurse ("SnapNurse" or "Defendant") for Summary Judgment ("Motion," Doc. 51). Defendant filed a response to the Motion ("Response," Doc. 66). Plaintiffs[1] filed a Reply in support of the Motion ("Reply," Doc. 79). In addition, the parties each filed supplemental briefs. (Docs. 69, 72).[2] Having reviewed and considered these materials and all matters properly of record, the Court will deny the Motion.

---

[1] The Court uses "Plaintiff" in the singular to refer to Representative Plaintiff Erica Ramirez, and "Plaintiffs" in the plural to include all opt-in plaintiffs.

[2] Also pending before the Court is Plaintiffs' Motion for Scheduling Order, (Doc. 46), previously stayed by the Court (Doc. 68). The Court will address this below.

## Background

SnapNurse is a company that obtains contracts from clients such as healthcare facilities or testing sites, and provides clinicians, including travel nurses, to their facility or location depending on the details of their contract. (Deposition of Kim Grant dated November 15, 2021 ("Grant Dep.") at 13:6–16, Doc. 61).[3] In other words, SnapNurse is the vehicle to reach out to travel nurses for the facility that may need them. (*Id.*).

Once SnapNurse forms a contract with a facility, they recruit nurses. (*Id.* at 26:16–18). In order to recruit nurses, SnapNurse runs social media advertisements or campaigns. (Def.'s Statement of Material Facts ("SMF") ¶ 3, Doc. 51-2; Pl.'s Resp. to SMF ("RSMF") ¶ 3, Doc. 74).When recruiting nurses, SnapNurse advises them of their rate of pay and other financial arrangements based on the rates they contracted with the client for. (Grant Dep. at 26:20–27:6).

Once a nurse has expressed interest in taking the assignment or agrees to take the assignment, they are sent a Confirmation of Assignment ("COA"). (*Id.* at

---

[3] It is rare for a case to engender such litigiousness about the record that the parties dispute the nature of the defendant company based on a fairly straightforward deposition excerpt. The parties are reminded that the purpose of the factual statements is to aid the court in framing the dispute and identifying the presence or absence of factual disputes and that that purpose is hindered by excessively argumentative factual statements or responses. *See* LR 56.1(B)(1), (2) (precluding facts which are "stated as an issue or legal conclusion" and requiring responses to be "nonargumentative.").

29:17–29). The COA outlines SnapNurse's expectations of the position, as well as the compensation, benefits, the assignment itself, and schedule. (*Id.* at 28:18–29:1). As part of the onboarding process, a nurse must provide various documents, including but not limited to a negative drug screen, a negative COVID test, a skills checklist, background check, an I-9 form, and licensing information. (SMF ¶ 5; RSMF ¶ 5). Some of this information may be provided in advance; however, there is certain information that must be submitted at the job site. (SMF ¶ 6; RSMF ¶ 6). While some nurses may be local, other nurses travel across states to accept an assignment at a designated healthcare facility. (SMF ¶ 7; RSMF ¶ 7).

In August of 2020, SnapNurse contracted with the State of Florida to provide nurses to Fort Lauderdale healthcare facilities to conduct Covid testing. (SMF ¶ 8; RSMF ¶ 8). SnapNurse recruited nurses for the assignment in Florida. (SMF ¶ 9; RSMF ¶ 9).

Plaintiff Erica Ramirez and Opt-In Plaintiffs Michael Lackowski, Teresa Burns, Deirdre Dunn, Ameera Brewer, Kristin Hill, Mia Francis, Cassandra Lacey, and Tessie Sampson (collectively, "Plaintiffs") learned about the assignment in Florida and pursued the opportunity to work with SnapNurse. (SMF ¶ 10).[4] SnapNurse provided some of the Plaintiffs with a SnapNurse Covid Mission

---

[4] The Court agrees with SnapNurse that Plaintiff's response to SMF No. 10 does not directly refute its point, and it is therefore deemed admitted.

Information Sheet ("MIS"). (SMF ¶ 11).[5] The MIS provided the following assignment information:

**Assignment Information**
**2-week Contracts**
**Anticipated Travel Date:** 8/19/2020     **Anticipated Start Dates:** 8/22-8/24/2020
**Orientation Dates:** On Start date     **Anticipated End Dates:** 9/4-9/6/2020

(Doc. 1-1). The MIS further provided:

> Guaranteed Hours: To receive the 48-hour guarantee, you are required to be available and eligible to work all assigned hours. Guaranteed Hours are paid at the regular rate of pay with OT rates if needed. Guaranteed hours will be from the start of the assignment on 8/23/2020, not upon arrival at the hotel.

(*Id.*). The MIS provided that in-processing for the assignment would "be held between 8/19/2020 and 8/23/2020 between 7 am and 7 pm." (*Id.*). The MIS provided that "[a]ll tax forms need to be completed no later than in processing at the hotel with SnapNurse." (*Id.*). The MIS also provided nurses with the option to either fly or drive to Fort Lauderdale and stated that SnapNurse would cover certain travel costs. (*Id.*). Regarding shift information, the MIS provided as follows:

> You shift is assigned on-site. There is no Guarantee of Shift time. This is an emergency staffing project. All applicants must be flexible by committing to working at least 12 hours per day and floating to units in which you are qualified to work.

---

[5] The Court deems this fact admitted for the same reason the Court gave in note 4, *supra*.

(*Id.*). It also contained miscellaneous details about dress code and scrubs. (*Id.*). The

MIS required applicants to take and pass a drug screen:

> You must pass a 10 panel drug screen for controlled
> substances before working. If you take any prescribed
> medications where you believe you may test positive on
> a 10-panel drug test, you must notify a recruiter and
> arrange your own drug screen and review before you
> travel. If you do not pass the drug screen, you may not
> work and will be responsible for your travel costs. You
> may not work if you test positive onsite.

(*Id.*). SnapNurse told nurses interested in the assignment to report to the Embassy

Suites in Ft. Lauderdale, Florida. (SMF ¶ 20; RSMF ¶ 20). The COA for the

assignment contained the following assignment details:

| Assignment Name | State of Florida Covid Response |
|---|---|
| Location | Embassy Suites 1100 SE 17th Street Fort Launderdale, FL 33316, US |
| Unit | RN |
| Assignment Length (weeks) | 2 |
| Start Date | 8/22-8/24 |
| End Date | 9/5-9/6 |
| Shift | Varies as needed by COVID Testing Sites |
| Notes | Some Testing Sites are mobile (require driving to site) and some stationary (Patients Drive-Up) |

(Doc. 66-5). It further provided as follows:

5

Confirmation of Assignment

We believe that your experience and professional skills will benefit our organization and our clients. We are pleased to make the following offer to you for the position of xxx with SnapNurse. Details of the offer are as follows:

Conditions:

Your employment with the company is on an "at-will" basis, which means that both the company and you are free to terminate the employment relationship at will, without any cause or notice. As an "at-will" employee, your job duties, title, compensation, benefits, and the personnel policies and procedures to which you are subject may change at any time. Neither this letter, nor any communications between you and the company, creates any contract of employment of any nature between you and the company. The "at-will" nature of your employment may only be changed in an express written agreement signed by you and the company's Chief Operating Officer.

Your employment is contingent upon the successful completion of SnapNurse on-boarding that includes providing legal proof of your identity, meeting background check and drug screening requirements, license verification, and the successful completion of certification specific skills checklist and competency exams. You may be required to complete additional facility or setting specific documents and/or training depending on future assignments.

Guaranteed Hours:

Terms for Guaranteed hours are as follows:

Guaranteed hours are only honored your first week if you start on a Sunday or Monday.

Guaranteed hours are void if any of the following occurs:

Facility ends contract early

Worker ends contract term early

Worker calls out of a shift

Worker is late to shift

If worker requests any days off during assignment the pay week they are off guaranteed hours do not apply[.]

There are times when a facility will experience low census. SnapNurse partners are expected to float to other units (with in their scope of practice) throughout the hospital. Refusal to float or perform administrative duties may forfeit guaranteed hours or may result in the cancellation of your assignment.

We are excited to have you on our team caring for the patients of SnapNurse's client facilities. Congratulations and welcome to the SnapNurse team!

(*Id.*). It also provided compensation terms as follows:

| Base Hours (Weekly) | 48 |
| Guaranteed Hours (Yes/No) | Yes |
| Regular Rate | 77 |
| Orientation Rate | 77 |
| Overtime Hourly Rate | 115.5 |
| Holiday Rate | 115.5 |

(*Id.*). Lastly, it provided that "[b]y typing your name below, you are confirming that you have read, understand and accept the terms and conditions of employment contained in the offer and confirmation of assignment by SnapNurse." (*Id.*).

7

Although almost all of the Plaintiffs had prior experience working as travel nurses for other agencies, most had never worked for SnapNurse prior to applying for the assignment in Fort Lauderdale. (SMF ¶ 21; RSMF ¶ 21). Some Plaintiffs chose to fly to the worksite, while other Plaintiffs chose to drive. (SMF ¶ 24).[6] SnapNurse either paid or reimbursed nurses for their travel costs to and from Fort Lauderdale. (SMF ¶ 25).[7]

The parties dispute what happened once the nurses got to Fort Lauderdale. SnapNurse's Vice President of Human Resources Kim Grant testified that "if a nurse was interested in this particular assignment, they would go to the Embassy Suites, which is essentially, again, an open kind of job fair in which the nurse would present whatever was remaining for them to be credentialed, be drug tested, COVID tested, et cetera. So, again, it's another step in the process to become eligible for employment for this assignment." (Grant Dep. at 51:25–52:6).

Opt-in Plaintiff Mia Francis testified that "when [she] arrived at the hotel, it was mass confusion with over a hundred and something nurses in the lobby." (Deposition of Mia Francis dated November 8, 2021 ("Francis Dep.") at 40:3–4).

---

[6] The Court deems this fact admitted for the same reason the Court gave in note 4, *supra*.

[7] The Court deems this fact admitted for the same reason the Court gave in note 4, *supra*. Moreover, it appears that Plaintiff is no longer bringing a claim for travel expenses. (Reply at 10).

After she checked in and got a room, she testified that she "stood in line for the induction, which is our intake." (*Id.* at 40:4–6). After she "stood in line for about an hour," she testified that "one of their staff yelled out, 'We're done for the day. Come back tomorrow.'" (*Id.* at 40:6–8). Other nurses testified to long lines or general disorder when they arrived. (Deposition of Kristin Hill dated November 4, 2021 ("Hill Dep.") at 50:8–51:3, Doc. 57; Deposition of Stacy Ann Head ("Head Dep.") dated at 41:16–20, Doc. 60).

There is no genuine dispute that SnapNurse never provided Plaintiffs with work at the Fort Lauderdale site. (SMF ¶ 33).[8] Instead, on or around August 25, 2020, SnapNurse sent a text message to Plaintiffs stating as follows:

> SnapNurse has filled all the mission positions for the State of Florida. If you have not received a mission, then you must check out of the hotel today or tomorrow. New missions will be issued to SnapNurse to start on 9/5. Reply YES if you want to be placed on the priority list for 9/5 start or NO if you want to be removed.

(SMF ¶ 32).[9] However, the parties vigorously dispute what happened between the Plaintiffs' check in and the sending of that text message. Defendant asserts that

---

[8] Plaintiffs purport to dispute this fact by asserting in response that "Defendant failed to provide Plaintiffs with assignments for their guaranteed hours." (RSMF ¶ 33). This confusing and argumentative response is overruled.

[9] Again, Plaintiffs purport to deny this fact, which straightforwardly quotes an exhibit, by providing non-responsive background information and before eventually apparently agreeing that "Defendant informed plaintiffs via text message that they would not be provided with assignments and must leave the

"[w]hile waiting for an assignment, Plaintiffs had the opportunity to use their time to pursue personal activities of their choice," citing excerpts from the nurses' depositions that indicated that they went to restaurants, went to the beach, saw relatives who lived nearby, talked to each other, went to Miami, went on a boat cruise, and went shopping for souvenirs. (SMF ¶ 29) (collecting citations). However, Plaintiffs cite deposition excerpts of their own, arguing that "[b]ut for some personal errands, most Plaintiffs continued waiting for multiple days at the Embassy Suites, on standby for assignments that could be issued at any moment." (RSMF ¶ 29) (citing Hill Dep. at 53:20-25 ("We were told that we could report at midnight if we needed to, so I was basically, I felt like I was in a stage for readiness, you know, at that time. I was told to stand by, have your phone near you because we could be called at any time to work."); Deposition of Michael Lackowski dated November 3, 2021 at 63:7–10, Doc. 66-8 ("I pretty much stayed there. I was glued to the place because at any time, they would send out a blast text that would say we need you down in conference room 3, let's say."); Head Dep. at 44:9-10 ("We were waiting for SnapNurse to give us further instruction. We were just waiting."); Deposition of Dierdre Dunn dated November 2, 2021 at 55:8–9, Doc. 66-1 ("We were not -- we were told we were not allowed to leave the facility.")).

---

hotel." (RSMF ¶ 33). This is argumentative and wasteful of the Court's time. This objection is overruled. Plaintiffs' should cabin their own characterization of the facts to their statement of additional material facts or brief as applicable.

Plaintiff Erica Ramirez filed this putative class action and FLSA collective action on February 23, 2021, alleging that SnapNurse is liable for its failure to pay her and members of the putative class for all hours worked and time and a half for hours worked in excess of 40 and for its failure to provide work as guaranteed by its contract. (Compl. ¶¶ 10, 33, Doc. 1).

**Legal Standard**

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element

of] the nonmoving party's case." *Celotex*, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. *Fitzpatrick*, 2 F.3d at 1115 (citations omitted).

## Discussion

### I.    Motion for Summary Judgment

SnapNurse first seeks summary judgment as the FLSA claims on the grounds that no employment relationship exists between it and Plaintiffs. Relatedly, SnapNurse seeks summary judgment on the contract claim on the basis

that no employment contract exists between the parties. The Court considers these issues together.

"It is well-established that the issue of whether an employment relationship exists under the FLSA must be judged by the 'economic realities' of the individual case." *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 470 (11th Cir. 1982) (quoting *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1189 (5th Cir. 1979)). While "the terms the parties use are not controlling when we inquire whether an individual is an employee or a volunteer under the FLSA," the existence and terms of an employment agreement are certainly probative of what the parties understood the economic realities to be at the time of their engagement. *Purdham v. Fairfax Cnty. Sch. Bd.*, 637 F.3d 421, 429 (4th Cir. 2011) (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150–51 (1947)); *cf. Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 806 (11th Cir. 1992) ("The contract may very well be probative of the type of work period under which the city has chosen to pay its employees."). Thus, the Court first examines whether a contractual relationship did, in fact, exist between the parties.

The Court previously ordered supplemental briefing on the issue of which state's law governs Plaintiffs' contract claims. (Doc. 68). SnapNurse, in its supplemental brief answered the question as follows:

> Georgia courts generally adhere to the rule of *lex loci contractus* to evaluate the enforceability of a contract in

> the absence of a choice-of-law provision. *U.S. Security Associates, Inc. v. Lumby*, Case No. 1:18-cv-5331-TWT, 2019 WL 8277263, * 7 (N.D. Ga. Sept. 25, 2019). The rule of lex loci contractus mandates that, where the contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is performed will apply. *Id.* Because the potential assignments were to be performed in Florida, its law applies.

(Doc. 69 at 3).

"However," as Plaintiffs point out, "Georgia's *lex loci contractus* rule is subject to an exception . . . ." *Fritz v. Fed. Warranty Serv. Corp.*, No. 1:20-CV-2210-MHC, 2021 WL 359765 (N.D. Ga. Feb. 1, 2021). That is, that "the application of another jurisdiction's laws is limited to statutes and decisions construing those statutes. When no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law." *Id.* (quoting *Frank Briscoe Co., Inc. v. Ga. Sprinkler Co., Inc.*, 713 F.2d 1500, 1503 (11th Cir. 1983) and citing *Coon v. Med. Ctr., Inc.*, 797 S.E.2d 828 (Ga. 2017)).

In Florida, common law governs the formation of contracts except "with respect to transactions in goods." *Suarez Trucking FL Corp. v. Souders*, 350 So. 3d 38, 43 n.1 (Fla. 2022) (citing Fla. Stat. § 672.207) (2021));[10] *see also* Florida Contract & Business Jury Instructions No. 416.3, Sources and Authorities ¶ 1 ("The general

---

[10] SnapNurse did not point to any applicable Florida statute in its supplemental brief.

rule of contract formation was enunciated by the Florida Supreme Court in *St. Joe Corp. v. McIver*, 875 So.2d 375, 381 (Fla. 2004) ('An oral contract . . . is subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms.')"). Thus, under *Coon*, the Court must look to Georgia common law on contract formation.[11]

Under Georgia law, "[t]here are four essential elements to a valid contract: (1) there must be parties able to contract; (2) consideration; (3) assent of the parties to the terms of the contract; and (4) a subject matter upon which the contract can operate." *Cashatt v. Merrimac Assocs., Inc.*, 853 F. Supp. 2d 1244, 1249 (N.D. Ga. 2012) (quoting *Mitchell v. Ga. Dep't of Cmty. Health*, 635 S.E.2d 798, 805 (Ga. Ct. App. 2006)). "Beyond those elements, in the employment context

> [t]he nature and character of the services to be performed, the place of employment and the amount of compensation to be paid therefor are all essential elements of an employment contract and must be stated with sufficient definiteness to enable one to ascertain the intent of the parties as to these vital features of the contract. If any portion of the proposed terms is not settled, or no mode agreed on by which it may be settled, there is no agreement.

*Id.* (quoting *Farr v. Barnes Freight Lines, Inc.*, 101 S.E.2d 906, 907 (Ga. Ct. App. 1958)).

---

[11] Neither party raised any constitutional objection to applying Georgia law. *Cf. Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985)).

SnapNurse asserts that the MIS does not constitute an enforceable contract for four reasons: (1) "the MIS does not include the amount of compensation to be paid (or even a method of calculating compensation)"; (2) "while the MIS informs applicants that they should report to the Embassy Suites in Fort Lauderdale for onboarding, the MIS does not identify a particular healthcare facility where Plaintiffs may eventually be assigned to work."; (3) "the MIS does not define the services to be performed, except for stating in very general terms"; and (4) "the MIS does not address Plaintiffs by name, nor is it executed by either party." (Br. Supp. MSJ at 22–23).

In response, Plaintiffs point not to the MIS, but to the COA. SnapNurse vigorously objects to this citation, asserting that because Plaintiffs pled that the MIS was the contract upon which their breach claim was pled, their claims must rise and fall on the MIS. (Reply at 3). However, this argument relies on a false premise: that a "contract" is always a single document. In fact, "a written contact can consist of multiple documents." *Bd. of Regents of Univ. Sys. of Georgia v. Tyson*, 404 S.E.2d 557, 558–59 (Ga. 1991).

Moreover, there was no requirement that the contract in this case be written at all. As the contract only provided for at most 40 hours of work, it was not subject to the statute of frauds. O.C.G.A. § 13-5-30(5) (requiring a writing for "[a]ny

agreement that is not to be performed within one year from the making thereof").[12]
And, neither the MIS nor the COA contain an "integration" or "merger" clause.
"If the writing does not purport to contain all the stipulations of the contract, parol
evidence shall be admissible to prove other portions thereof not inconsistent with
the writing . . . ."Ga. Code Ann. § 24-3-2 (West).

SnapNurse does not argue that the MIS and COA are inconsistent, but that
Plaintiffs relied on the MIS and not the COA in bringing their claims. (Reply at 5).
But the Court finds that the two documents can be read together to memorialize a
single agreement. Plaintiffs note that

> The MIS is not the only document that defined the terms
> of employment, the COA listed out provisions of the
> employment contract too. When taken together, the
> agreement provided information on salary ($77 per
> hour), overtime pay ($115.50 per hour), guaranteed
> hours, dress code, travel policy, reimbursement policy,
> and so forth. *See*, COA; MIS. The terms that were left
> undefined in the agreement are to be expected, given the
> emergent circumstances underlying the placement. The
> fact that nurses weren't assigned to "a particular
> healthcare facility" is to be expected, as these nurses were
> traveling under emergent circumstances. *See*, MIS. When
> COVID is constantly changing, so are the health needs of
> a particular area; giving only a general area of the
> location allows for some flexibility in nursing
> placements, so that they can match the needs of the
> community. Defendant also states that the MIS does not
> define the services to be performed, however, the COA

---

[12] Florida's Statute of Frauds contains a similar provision. Fl. Stat. § 725.01
(requiring a writing for "any agreement that is not to be performed within the
space of 1 year from the making thereof.").

clearly states that the shifts will vary, "as needed by COVID Testing Sites." *Id*. Again, this allows for flexibility in assigning work to nurses in the most beneficial way possible. Although the MIS does not name the Plaintiffs, the COAs required that each nurse type their name to authorize that they had read and agreed to the terms of the agreement. *See*, COA.

(Resp. at 17). The Court agrees. The COA and MIS taken together clearly provide "[t]he nature and character of the services to be performed, the place of employment and the amount of compensation to be paid therefor." *Cashatt*, 853 F. Supp. 2d at 1249 (quoting *Farr*, 101 S.E.2d at 907).

SnapNurse next argues that Plaintiffs have failed to satisfy conditions precedent to receive the hours guarantee under the COA and MIS.[13] SnapNurse alleges that Plaintiff Ramirez did not complete her onboarding requirements because she did not obtain a negative drug screen. (Reply at 9). As an initial matter, it is not clear to the Court that SnapNurse preserved a defense of condition precedent. In her Complaint, Plaintiff alleged that "[p]ursuant to her contract with Defendant, Plaintiff was guaranteed to be paid for 48 hours of work. Plaintiff's guarantee was conditioned on Plaintiff being available to work." (Compl. ¶ 32). SnapNurse denied this allegation, but Federal Rule of Civil Procedure 9(c) requires that "when denying that a condition precedent has occurred or been performed, a

---

[13] The Court will not entertain SnapNurse's argument that Plaintiff Ramirez is not entitled to compensation because she "arrived on a Friday, not a Sunday or Monday." (Reply at 8–9).

party must do so with particularity." No mention of this condition precedent is made in response to Paragraph 32 and no mention of the drug test requirement is pled anywhere in the Answer. But assuming SnapNurse has preserved the issue, there is a fact dispute about whether the condition precedent was excused as to Plaintiff Ramirez, (RSMF ¶ 27) and as to other Plaintiffs where Defendant apparently did not have enough drug testing kits for nurses to use during the onboarding process (RSMF ¶ 19). *See AAF-McQuay, Inc. v. Willis*, 707 S.E.2d 508, 520 (Ga. Ct. App. 2011) (waiver); *see also* O.C.G.A. § 13-4-23 (excusing nonperformance of a contract caused by the conduct of the opposite party); O.C.G.A. § 13-3-5 (excusing impossible conditions).

In light of the Court's finding that SnapNurse is not entitled to judgment as a matter of law on the existence of an employment contract and that there are factual disputes on the issue of whether the contract was breached, the Court must also find that factual disputes preclude the determination of whether and when an employment relationship arose under the FLSA.[14] As the Court noted above, the existence of an employment contract is probative evidence of the economic realities of the parties' relationship. Likewise, factual disputes preclude summary judgment on the issue of whether the time the Plaintiffs spent waiting for

---

[14] For similar reasons, there is a factual dispute precluding summary judgment on the promissory estoppel claim.

assignment was compensable. *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 807 (11th Cir. 1992).

## II.    Motion to Modify Scheduling Order

Plaintiffs seek an Order modifying the Scheduling Order to permit them to belatedly move for class certification. At a January 13, 2022 status conference before Judge Totenberg, Plaintiffs asserted that they would not need additional discovery to proceed with class certification. (Doc. 67 at 9:3–5). SnapNurse also seemed to signal it would not need discovery to brief the certification issue, but reserved its right to seek discovery after a certification decision was made. (*Id.* at 14:3–19). In light of this agreement, the Court finds that there is minimal to no prejudice on Defendant in reopening the deadline to file a class certification motion. As such, the Court will modify the Scheduling Order as set forth below to provide a briefing schedule for class certification and conditional certification.

However, in light of counsel's failure to timely seek class certification and failure to file a timely response to Defendant's Statement of Material Facts (Doc. 70) both in violation of the Court's Local Rules, Plaintiffs are directed to include in their brief a discussion of whether, absent association with a local firm specializing in these sorts of actions, Plaintiffs' counsel is adequate to serve as class counsel under Federal Rule of Civil Procedure 23(g)(1) and (4).

**Conclusion**

For the above reasons, it is

**ORDERED** that Defendant's Motion for Summary Judgment (Doc. 51) is

**DENIED**. It is

**FURTHER ORDERED** that Plaintiffs' Motion for Scheduling Order (Doc.

46) is **GRANTED** and the Scheduling Order in this case is modified as follows:

- Plaintiff's Motion for Class Certification Pursuant to Rule 23 is due on Monday, April 17, 2023;

- Plaintiff's Motion for Conditional Certification Pursuant to the Fair Labor Standards Act is due on Monday, April 17, 2023;

- Defendant's response to Plaintiff's Motion for Class Certification Pursuant to Rule 23 is due on Wednesday, May 17, 2023;

- Defendant's response to Plaintiff's Motion for Conditional Certification Pursuant to the Fair Labor Standards Act is due on Wednesday, May 17, 2023;

- Plaintiff's Reply in Support of Motion for Class Certification Pursuant to Rule 23 is due on Wednesday, May 31, 2023; and

21

- Plaintiff's Reply in Support of Motion for Conditional Certification Pursuant to the Fair Labor Standards Act is due on Wednesday, May 31, 2023.

**SO ORDERED** this 28th day of March, 2023.

Victoria Marie Calvert
United States District Judge